UNITED STATES DISTRICT COURT
DISTRICT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

|  |  |  |
|---|---|---|
| DAVID A. WHITAKER | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action 3:20-cv-00024 |
| | ) | |
| JAMES C. MARTIN | ) | |
| | ) | |
| Defendant. | ) | |

---

## COMPLAINT

---

**COMES NOW**, PLAINTFF, DAVID WHITAKER ("PLAINTIFF" or "WHITAKER"), by and though the undersigned counsel, Robert V. Goldsmith, III, and files this COMPLAINT against Defendant JAMES MARTIN ("MARTIN" or "DEFENDANT") and as grounds for the same, states as follows:

### NATURE OF ACTION

1. This is a breach of contract, fraud, and Fair Debt Collection Practices Act action, primarily, arising out a five-year leasehold between Plaintiff and Defendant.

### JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because this is an action between citizens of different states, and the amount

1

in controversy exceeds $75,000.00.  In addition, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C § 1692 et seq., as well other federal law.

3. Venue properly lies in the District of the Virgin Islands pursuant to 28 U.S.C. § 1391(b)(2) and (3), and 9 U.S.C. § 9, because the realty made the subject of the contract, and the actions related to the same exist and occurred in St. Thomas, Virgin Islands.

### THE PARTIES

4. PLAINTIFF is an individual who, at all times material to this action, resided in Massachusetts and who entered into a lease for a vacation home in St. Thomas, Virgin Islands that would be used for commercial purposes in support of his business.

5. DEFENDANT is an individual who, upon information and belief, permanently resides in St. Thomas, U.S. Virgin Islands.  DEFENDANT is a citizen of the U.S. Virgin Islands.

6. NONPARTY, GINGER MARTIN is the spouse of DEFEDNANT and may be referred to herein collectively with DEFENDANT as "MARTIN."

### FACTS

### THE LEASE

7. On or about December 18, 2019, after discovering a rental offering on Craigslist.com, Plaintiff and Defendant entered into a five-year contractual agreement for the lease of property described as Villa Alhambra, St. Peter,

2

located at 3A-20 and 21 Estate Peter, St. Thomas, Virgins Islands (the "Property") that included the "shar[ing] of the parking, pool, and spa facilities" (the "Lease") A copy of the Lease is attached hereto and incorporated herein as **Exhibit A.**

8.   Under the terms of the lease, Whitaker was to have access to the Property, with all possessory rights and rights of quiet enjoyment for a period of sixty (60) months and in return, Whitaker would make monthly payments of $9,650.00. The Lease also provided that Whitaker was also given a ""Right of First Refusal" when the Property and Villas are placed on the marker "FOR SALE" for the 5-year lease period." During the roughly two months Whitaker was in the home, he paid Martin the total sum of Forty-five Thousand Four Hundred and Twenty-five ($45,425.00) dollars.

9.   As set out below and based on the expectation of a five-year lease, Whitaker invested substantial money in materials and labor repairing and improving the Property, totaling well in excess of One Hundred Thousand ($100,000) dollars during the approximately two (2) months he was allowed on the premises.

10.  On February 26, 2020, in violation of the Fair Debt Collection Practices Act, Martin sent a letter demanding payment on an inflated and inaccurate amount for rent and services not provided and instructing Whitaker to pay $23,547,35 or leave, but also to pay *and* leave. A copy of the Eviction Letter is attached hereto as **Exhibit B**. The letter further indicated Whitaker was

in breach of the lease by having dogs on the Property and because he made changes to the Property.  Martin informed Whitaker that a police report had been field for the pruning work Whitaker performed on the grounds.

11. On March 1, 2020, Martin changed the locks and forbade entry onto the home with some of Whitaker's possessions remain on Property, including medication and cash.

12. Counsel for Whitaker notified counsel for Martin of the urgent need for the medication on March 3, 2020. Entry was denied and Whitaker was informed Martin was "off-island" and no one could let them in, notwithstanding the fact that Martin's housekeeping and grounds crew had access. A copy of a letter from Whitaker's physician is attached hereto as **Exhibit C.**

## MANAGEMENT AND HANDLING OF LEASEHOLD

13. Whitaker runs a marketing agency representing professional athletes The Lease, under an unnumbered section labeled "TENANTS and GUEST" provided that "This Alhambra the Main Villa and the Tower Villa may be used for business purposes."

14. Maid service was to be provided at a cost of $500.00 per week, Monday through Friday, along with removal of trash.

15. Pets were permitted under the Lease.

16. Electric Utility Service was to be reimbursed under the Lease.

17. Pool, spa, and deck areas were subject to weekly inspection and cleaning.

18.   Electricity was to be billed to tenant monthly as "reimbursement" based on two separate meters.

19.   Cable TV was to be billed to tenant and "reimbursed" at $175.00 monthly.

20.   Landlord was to enter the home only on reasonable notice and at reasonable time to make repairs, check the status of the home, and to show future clients three months before the termination of the lease.

21.   On December 16, 2019, Whitaker wired Martin $**19,200.00** as requested by Martin in order to gain access to the Property.

22.   On December 18, 2020, Whitaker asked for the spa to be repaired and offered to pay for the repair.

23.   Martin's spouse, Ginger Martin, provide names for repair companies to Whitaker, suggesting to Whitaker that it was his responsibility.

24.   On December 20, 2019, Martin emailed Whitaker an invoice on letterhead for James Clevenger Martin Company – Art and Architectural Management Company Texas – New York – Virgin Islands, requesting payment of $9,650.00 for January 2020 rent and $1,000.00 for two weeks of maid service.

25.   On December 20, 2020, Whitaker wired Martin $10,650.00. Martin invited Whitaker to his home for drinks that day.

26.   On December 21, 2020 Martin approved Whitaker's request for the addition of window coverings. Whitaker paid for the change.

27.     On December 23, 2020, Whitaker agreed to lease the "Guest House" separately and in addition to the Property for $500.00 per night on an as-needed basis and per availability.

28.     The same day Whitaker requested to replace outdoor furniture that was non-functional. Martin indicated an intent to throw it away and suggested locations to Whitaker for replacements. Whitaker replaced the outdoor furniture at his expense. Martin thanked him and complimented the new items. In the same exchange, Martin expressed and intent to replace the outdoor lamps.

29.     On December 26, 2020, Whitaker photographed athletes wearing their respective sponsors' brands and shred the photos with Martin. While it was little more than a photograph in a branded tee shirt, the actions were expressly permitted under the lease. Martin responded that the athletes and Whitaker's business would become more popular with photos on the Property.

30.     That same day, the house was flooded during a rain and Whitaker suffered a loss of property. The flooding continued each time it rained. He sent Martin photos of the flooding. He further noted water was coming through light fixtures and offered to replace.

31.     Martin acknowledged the problem, apologized, and stated that **"whatever needs to happen, we will support."**

32. That same day, Martin sent correspondence offering to rent another property to Whitaker in Estate Harmony, US Virgin Islands.

33. On December 30, 2019, Martin sent correspondence asking Whitaker if he wanted to rent the Guest House.

34. On December 30, 2019, Martin, pleased with the tenant or the amount of income, or both, offered to rent the Harmony House for $200,000 for five years with a deposit of $34,000 "on written lease or upon return to St. Thomas. The security deposit is non-refundable if no lease is agreed to" and $17,000 per month going forward.

35. On December 31, 2020, Martin sent correspondence to Whitaker offering Harmony House for $15,000 per month and added a credit against the purchase price of $30,000 in an effort to induce Whitaker to rent more property.

36. On January 1, 2020, Whitaker asked about the spa being repaired.

37. The same day, Whitaker asked about an unfinished room on the site. Martin indicated it was going to be a gym. Whitaker asked to complete the project. Martin replied, **"Why not!!"**

38. The same day, Whitaker notified Martin the refrigerator was still not working, and the garbage disposal was not working.

39. On January 5, 2020, not feeling taken advantage of, Whitaker requested the spa, disposal, and refrigerator be repaired.

40. During the month of January, continued repair requests were made.

41. On January 9, 202, Martin sent Whitaker correspondence offering to build the gym, stating Whitaker would reimburse Martin for all labor and materials. Martin encouraged Whitaker to include his staff to save money.

42. On January 12, 2020, Whitaker requested to add broadband fiber optic service to the Property. There was no fiber near the Property and installation would come at a significant cost to Whitaker to run lines up the mountain. Martin signed a letter that permitted the installation with knowledge that the installation and contract totaled over $40,000. Whitaker paid $16,500 to have fiber to have fiber optic run from the nearest point up to the Peter Mountain Property.

43. The same day, Whitaker notified Martin that their guest – a family friend of Martin staying on Property – had fallen in the darkness and been very badly injured. Later, one of Whitaker's clients also fell and was badly injured.

44. On January 13, 2020, Whitaker and Martin exchanged detailed correspondence regarding Whitaker's replacement of damaged lighting, damaged carpet and other repairs, which included photos. Martin replied **"Wow!" "Love the center[light]." "Tile came out beautiful." and "Chandelier is magnificent."** To Whitaker's statement that he would repair the bathroom tile, Martin responded, **"Cool…thanks!"** In response to photos of a new bathroom shower filtered water shower fixture, Martin stated "**[We] need on up here."**

45. On January 16, 202, Martin sent correspondence to Whitaker:

"First: Maid Service: Ginger will address

Second: Pool Service (Not in Lease Agreement but tenants share)

Third: Hot Tube (Not part of Lease Agreement but tenants share)
NEW PUMPS & PARTS MUST BE ORDERED

Forth: Trash Removal: Your Construction debris is not a part of trash removal only the household trash is removed weekly.

Fifth: Ceiling tiles in Bathroom #1 & #2: This needs to be repaired but I'm not sure that the ceiling tiles are available anymore. I feel that rather than using the current type that is not holding due to the extreme humidity on the island, to repair with ceramic tile ceiling.

Sixth: Fence Paint: I stated to Milton that the fence color is the dark latex brown color. Some paint has been used and additional paint will be required for such an extremely large project.
Milton can arrange for more paint, but it will require reimbursement of all material cost and labor cost.

David, I return at the end of the month. This is two weeks away and we can address any or all of these issues. Milton is happy to assist with any requirements, but he works for me as a maintenance caretaker is not an electrician or a plumber."

46.     The same day, the Martin sent an inquiry about payment for use of the guest house which was not included in the lease. The request totaled approximately $10,000 in excess of the rent amounts already charged for the Property.

47.     Confused by the request to paint the fence and be change for the same, Whitaker asked for clarification and, later that day, sent the Martin following correspondence:

"Ginger,

Please know that I am simply looking to find an amicable resolution to some outstanding items and have no doubt that we can work together to accomplish that. I have also done my best to be understanding of James' health and to take care of things around the

9

property as needed, because otherwise it would adversely impact my use and enjoyment of this beautiful space. All things that I have done have been based upon our messages and urgent needs.

Since I moved in, we have experienced water damage of the property due to leaks and while we were told that Minton would fix the leaks, he did not do that, and rather than wait for additional damage, I had the work done at my expense and as a result, during the last three heavy showers of rain and wind, the building has remained dry.

While checking out the accommodations we discovered that the bottoms of several mattresses were covered in mold, and with your approval we replaced each of them. The carpet in bedroom 2 smelled of mold and with your approval, we removed it and replaced it with tile. The spa has not worked for most of our lease even though their use is included in the lease along with weekly inspections and cleaning, and while Milton has managed to fix broken toilets, the spa remains unusable. We also found that the showerheads were broken in three of the bathrooms. We replaced them and sent you photos of the completed work.

Several of the showers did not have hot water when we moved in, however two of them have since been required (I believe by Milton) and one remains unusable as it does not have hot water.

After wind damage the past few days, my guys have gone and fixed the damages cause by the winds.

My workers have scrapped and painted outside walls of the house. They were asked my Milton to paint gutters and railings and today the long stone wall. I don't believe that these repairs and expenses should be my responsibility which is why we are having this conversation.

The walkways are dark, causing one of my guests to injure his leg while walking along a path, so I had solar garden lights installed and sent to you in a video.

I have not even thought of charging you for any of these expenses I've paid which is why it was so surprising that your staff is asking us to do work at our expense and James then requesting payment from us for the work we paid to have done. The same though is true related to the gym.

We paid for services such as maid service and provisioning that we are still not receiving and Milton expressed he does not like taking the trash out more than he has in the past and while I can understand that the trash removal service included in the lease doesn't include construction debris, I would think that since I incurred the expense of the construction to repair your property, that I wouldn't also have to pay to remove the debris as well.

When we moved in you gave us a fair price and lease which is why I have been happy to improve the property when appropriate, however, one would think that there would be a credit due rather than a reimbursement due for my handling it.

It is possible that there is just a misunderstanding here, because how could a landlord charge a tenant for repairs that the tenant made to the landlord's property? That just doesn't make sense. Now, a credit against the rent from the landlord to the tenant for taking care of the landlords responsibilities regarding property maintenance seems more appropriate, and perhaps that is what you mean by "reimbursement," but I am just not sure, which is why I am writing to you for a better understanding.

Is the time and expenses that I've incurred to repair your property not worth a credit? And if not, are you actually intending on charging me additional for those expenses I've incurred? And what about the services included in the lease that you have not provided? The maid service, the DISH tv (which does not work), the weekly cleaning of the pool and spa (which does not function)? How do you intend to address these items?

Please don't read this text as an assault on your good nature and beautiful property. We can work this out, but I do need you to see this from my perspective; I've leased a beautiful place that needs much maintenance just to be live-able, and instead of receiving recognition for my efforts and expense, I'm met with threats of additional charges beyond the expenses I've incurred to maintain the property so that I can live in it.

Let's find a way to work this out please, because in the short time I've gotten to know you, I know that you only have the best intentions as landlords and am looking forward to enjoying my time here on this beautiful property.

I have canceled my video conferences and will ask Jonatan to send a reply to James"

48. On January 19, 2020, after Whitaker had expressed his dissatisfaction with the manner Martin was handling the relationship, Martin sent Whitaker the signed permission to have fiber broadband installed so that Whitaker could move forward with installation. This signaled to Whitaker that his concerns were heard and induced him to proceed with work. A copy of the signed letter is attached hereto as **Exhibit D.**

49. On January 30, 2020, Martin returned from New York and sent correspondence stating, **"The property looks magnificent."**

50. On February 2, 202, Whitaker complained about being overcharged for use of the guest house and for being charged for main service that was not provided. Martin apologized and indicated the maid may not have provided service because Whitaker had so many of his own workers.

51. Later that day, Martin sent an email as follows:

> "From: James Martin <jamesmartinusvi@earthlink.net>
> Subject: RENT & Reimbursement USVI
> Date: February 2, 2020 at 7:02:23 PM AST
> To: David Whitaker <david@monethos.com>
> Cc: Ginger Martin <gbmartin1@earthlink.net>
>
> David
>
> Ginger delivered you these invoices and I am sending these. They are the same ones.
>
> James Clevenger Martin
> c o m p a n y
> Art & Architectural Management Company
> Texas – New York – Virgin Islands
>
> James Clevenger Martin, AIA, CSI          3A-21 Estate St Peter
> P.O. Box 306827
> (340) 344-4348 mobile phoneSt Thomas, U.S. Virgin Islands

jamesmartinusvi@earthlink.net                    00803

February 1, 2020

David Whitaker
67 Summit Avenue
Winthrop, Mass 02152

RE: 3A-20 Main Villa & 3A-21 Tower Villa
Estate St Peter
St Thomas, US Virgin Islands 00802

MONTHLY RENT & REIMBURSEMENTS:
FEBRUARY 2020

S T A T E M E N T
As per Lease Agreement dated 12-18-2019:

FEBRUARY 2020 RENT……………………………$ 9,650.00

Maid Service: 1-1 thru 1-31-2020……………..   2,000.00
4 weeks @ $500.00

UTILITIES:
Dish TV – 12-31-2019:…………………………$ 199.02
Dish TV – 1-16-2020:…………………………...$ 191.53
WAPA Electricity (NO BILLING RECEIVED DURING LEASE
PERIOD)
3A-20 Main House Villa
3A-21 Tower Villa

TOTAL DUE FEBRUARY 2020
……………………………..$  12,040.55

CHECKS PAYABLE TO: James Martin

Please Direct Deposit to:
James Clevenger Martin
SS#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
BANCO POPULAR de Puerto Rico
Main Office: Charlotte Amalie, St Thomas, US Virgin Islands
ROUTING: #021606674
Account: #193029117
WIRE ONLY: #0215011 RT
Please e-mail me when & if Direct Deposit or Wire Only is sent

Thank You"

52.     On February 4, 202, Whitaker responded as follows:

"Hi Ginger,

I'm sorry that I'm just getting to this, I'm about 400 emails behind. We have two major events going and I'm working night and day.

I'm glad to hear things are going well with the guys and James. Today, one of my workers asked me to buy plywood for the 'gym' space. Let's open a talk about what this looks like going forward long-term. I'm happy to keep the guys here working on space that we are renting or have access. However, for the other areas on the property I feel it is simply is not in my interest to keep funding payroll and paying you rent to keep them here while I am also having to pay you extra rent for my other guests.

There is no immediate rush to discuss this. Let's think about it decide what works best for everyone.

Have a great night!

My best,

David"

53.     Whitaker followed that email with a second on February 5, 2020:

"From: David Whitaker <david@monethos.com>
Subject: Re: checking in
Date: February 5, 2020 at 10:48:14 AM AST
To: Ginger Martin <gbmartin1@earthlink.net>
Cc: Jonathan Kavner <jonathan@monethos.com>

Hi Genger [sic],

When we spoke and texted, I thought the gym would be a fantastic idea as a shared space. I was under the impression that the gym space would rent-free as a shared area. Milton provided direction to my team for repairs and clean up. We also spoke about $5,000 for the idea of renting the Architectural Studio and having my guys fixing

14

it up for me as an office.  When I received the below letter from James, and specifically the paragraph in bold below, we stopped working on the gym space, and we rented the needed space in Red Hook. Again, I do not see the benefit of paying for structural repairs and such for an area I do not own or even rent.

Upon return the end of this month, we can start making the necessary work in this area. Constructions required: Structural & Waterproofing corrections, new walls, new windows, stair caulking, exterior tile trim, flagpole replacement & fireplace repair. Other items may include: new tile floors, tiled walls, ceiling and walls plastered and additional lighting as needed. Plus, rearrangement of construction materials and tools. For this area of work, you will reimburse to me, the actual cost of all material and labor.

I did not respond to the letter. After, Milton asked my guys to scrap, wash, and paint the outside wall. I then received James' second letter requiring that "[I] reimburse all material cost and labor costs" for work I had no intention of doing at all in the first place. I already pay the GC $1,600 a week, the carpenter $1,400, the electrician $1,500, and their helper $800 in addition to their housing. I have also been paying for gardeners, two housekeepers, and $500 a week for your staff. When asked to reimburse you for labor for the people I employee was confusing and frustrating.

This morning, I spoke with James. I offered to keep the guys here for his use as needed, provided he buys supplies and includes consideration for our housing needs when we have a guest that does not have space to sleep due to workers filling up the Tower space we have rented for that purpose.

James informed me that my workers do not speak English (they do speak English); they are not available during times that he needs to work, and they work past 5:00. I overheard a conversation this morning while walking to my car of James speaking to your staff that frankly made me sad.

The next couple of weeks are crucial to my business.

If the use of my team is needed, feel free to reach out to me directly. I am happy to provide labor on a per-project basis. We can work off an approved estimate of a written estimate and scope of work for payment consideration or a reduction in rent.

Hope you're having fun off the island, let's grab lunch one day next week?"

54.     On February 6, 2020, expecting a high-profile client, Whitaker sent the
following to Martin:

> "FYI.  We have, **REDACTED** (very big movie star) coming with
> in and out over the next weeks.  The last time that he was here, he
> said someone thought he was our maintenance man.  I have provided
> the link to the profile of him below."

55.     Over the next weeks, Whitaker inquired with increasing frequency about the
lagging repairs to the Property and continued to invest money into improving
the Property that he believed was available for five years under the terms of
the Lease.

56.     On February 12, 2020, Martin informed Whitaker, **"Thank you (for
offering to make repairs]. If you want to have [your team] get [the
materials] and I will give you cash this afternoon."**

57.     On February 13, 202, Martin asked about February rent. The parties
discussed disagreement over the additional charges being sought by Martin.

58.     That day, Whitaker notified Martin of a fall his client had on Property,
provided photos, and requested insurance information. As of the time of this
filing, Martin ahs not released insurance information.

59.     On February 14, 202, Martin emails another invoice seeking amounts in
excess of the rent due under the lease. Whitaker asked for reimbursement
for his work based on what Martin would have paid and stated, you do not
have to pay what I paid for the better items, just whatever you would have
paid to repair and replace.

16

60. On February 19, 202, Whitaker wired Martin $8,259.45, deducting two weeks of maid services that was not provided and dish tv charges for dish that was not provided. Martin demanded $12,040.55.

61. Martin later demanded payment for electric utility service at the rate of nearly $100.00 per day and provided not bill.

62. During the period from late December 2029 until late February when the landlord entered the premises and changed the locks, Whitaker made the following payments to Martin:

| Payments to James Martin | | |
|---|---|---|
| Date | Description | Amount |
| 02/20/2020 | ONLINE OR MOBILE WIRE TRANSFER REF 20200220F2QCZ60C000509 BNF JAMES CLEVENGER | 2,390.55 |
| 02/19/2020 | ONLINE OR MOBILE WIRE TRANSFER REF 20200219F2QCZ60C003995 BNF JAMES CLEVENGER | 8,259.45 |
| 12/20/2019 | ONLINE OR MOBILE WIRE TRANSFER REF 20191220F2QCZ60C002107 BNF JAMES CLEVENGER | 10,650.00 |
| 12/18/2019 | ONLINE OR MOBILE WIRE TRANSFER REF 20191218F2QCZ60C000546 BNF JAMES CLEVENGER | 4,825.00 |
| 12/17/2019 | ONLINE OR MOBILE WIRE TRANSFER REF 20191217F2QCZ60C000722 BNF JAMES CLEVENGER | 19,300.00 |
| | | $45,425.00 |

63. During that time, Whitaker made the following payments to workers from Boston assisting him on the Property:

| Total for Boston Workers | | |
|---|---|---|
| Date | Description | Amount |
| 02/24/2020 | ONLINE OR MOBILE WIRE TRANSFER REF 20200224F2QCZ60C003063 BNF ANDRES PIMENTEL | 1,000.00 |
| 02/14/2020 | ONLINE OR MOBILE WIRE TRANSFER REF 20200214F2QCZ60C001784 BNF ROMER ANDRES | 830.00 |

| | | |
|---|---|---|
| 02/14/2020 | ONLINE OR MOBILE WIRE TRANSFER REF 20200214F2QCZ60C001782 BNF ANDRES PIMENTEL | 1,240.00 |
| 02/07/2020 | ONLINE OR MOBILE WIRE TRANSFER REF 20200207F2QCZ60C003913 BNF ANDRES PIMENTEL | 1,500.00 |
| 02/05/2020 | ONLINE OR MOBILE WIRE TRANSFER REF 20200205F2QCZ60C002126 BNF ANDRES PIMENTEL | 1,500.00 |
| 01/31/2020 | ONLINE OR MOBILE WIRE TRANSFER REF 20200131F2QCZ60C003935 BNF ROMER ANDRES | 1,570.00 |
| 01/27/2020 | ONLINE OR MOBILE WIRE TRANSFER REF 20200127F2QCZ60C000893 BNF ANDRES PIMENTEL | 500.00 |
| 01/24/2020 | ONLINE OR MOBILE WIRE TRANSFER REF 20200124F2QCZ60C001303 BNF ROMER ANDRES | 1,200.00 |
| 01/24/2020 | ONLINE OR MOBILE WIRE TRANSFER REF 20200124F2QCZ60C001300 BNF ANDRES PIMENTEL | 1,570.00 |
| 01/17/2020 | ONLINE OR MOBILE WIRE TRANSFER REF 20200117F2QCZ60C001646 BNF ANDRES PIMENTEL | 1,570.00 |
| 01/17/2020 | ONLINE OR MOBILE WIRE TRANSFER REF 20200117F2QCZ60C001645 BNF ROMER ANDRES | 1,200.00 |
| 01/14/2020 | ONLINE OR MOBILE WIRE TRANSFER REF 20200114F2QCZ60C000288 BNF ANDRES PIMENTEL | 225.00 |
| 01/10/2020 | ONLINE OR MOBILE WIRE TRANSFER REF 20200110F2QCZ60C000476 BNF ROMER ANDRES | 1,200.00 |
| 01/10/2020 | ONLINE OR MOBILE WIRE TRANSFER REF 20200110F2QCZ60C000474 BNF ANDRES PIMENTEL | 1,574.00 |
| 01/09/2020 | ONLINE OR MOBILE WIRE TRANSFER REF 20200109F2QCZ60C000331 BNF ANDRES PIMENTEL | 100.00 |
| 01/03/2020 | ONLINE OR MOBILE WIRE TRANSFER REF 20200103F2QCZ60C000603 BNF ANDRES PIMENTEL | 873.23 |
| 01/03/2020 | ONLINE OR MOBILE WIRE TRANSFER REF 20200103F2QCZ60C000601 BNF ROMER ANDRES | 857.00 |
| 12/24/2019 | ONLINE OR MOBILE WIRE TRANSFER REF 20191224F2QCZ60C000616 BNF ROMER ANDRES | 500.00 |
| 12/20/2019 | ONLINE OR MOBILE WIRE TRANSFER REF 20191220F2QCZ60C000999 BNF ROMER ANDRES | 300.00 |
| 12/20/2019 | ONLINE OR MOBILE WIRE TRANSFER REF 20191220F2QCZ60C000995 BNF ANDRES PIMENTEL | 2,000.00 |
| 02/28/2020 | ONLINE OR MOBILE WIRE TRANSFER REF 20200228F2QCZ60C000964 BNF JOSE NIETO | 500.00 |
| 02/24/2020 | ONLINE OR MOBILE WIRE TRANSFER REF 20200224F2QCZ60C003064 BNF JOSE NIETO | 1,000.00 |
| 02/14/2020 | ONLINE OR MOBILE WIRE TRANSFER REF 20200214F2QCZ60C001786 BNF JOSE NIETO | 1,000.00 |
| 02/07/2020 | ONLINE OR MOBILE WIRE TRANSFER REF 20200207F2QCZ60C003916 BNF JOSE NIETO | 1,200.00 |

| 01/31/2020 | ONLINE OR MOBILE WIRE TRANSFER REF 20200131F2QCZ60C003934 BNF JOSE NIETO | 1,200.00 |
|---|---|---|
| 01/24/2020 | ONLINE OR MOBILE WIRE TRANSFER REF 20200124F2QCZ60C001302 BNF JOSE NIETO | 1,200.00 |
| 01/17/2020 | ONLINE OR MOBILE WIRE TRANSFER REF 20200117F2QCZ60C001642 BNF JOSE NIETO | 1,200.00 |
| 01/10/2020 | ONLINE OR MOBILE WIRE TRANSFER REF 20200110F2QCZ60C000475 BNF JOSE NIETO | 1,200.00 |
| 01/03/2020 | ONLINE OR MOBILE WIRE TRANSFER REF 20200103F2QCZ60C000602 BNF JOSE NIETO | 1,200.00 |
| 12/20/2019 | ONLINE OR MOBILE WIRE TRANSFER REF 20191220F2QCZ60C003892 BNF JOSE NIETO | 800.00 |
| 12/20/2019 | ONLINE OR MOBILE WIRE TRANSFER REF 20191220F2QCZ60C000998 BNF JOSE NIETO | 875.00 |
| | Boston Workers | $32,684.23 |

64.     During that time, Whitaker made the following payments to local workers assisting him

on the Property:

| Check to Locals - see below | | |
|---|---|---|
| Date | Description | Debit |
| 02/24/2020 | DDA CHECK #0000000167 | $690.00 |
| 02/20/2020 | DDA CHECK #0000000114 | $2,100.00 |
| 02/20/2020 | DDA CHECK #0000000111 | $1,500.00 |
| 02/19/2020 | DDA CHECK #0000000112 | $868.91 |
| 02/12/2020 | DDA CHECK #0000000163 | $752.26 |
| 02/12/2020 | DDA CHECK #0000000110 | $670.00 |
| 02/10/2020 | DDA CHECK #0000000161 | $1,000.00 |
| 02/10/2020 | DDA CHECK #0000000109 | $1,000.00 |
| 02/06/2020 | DDA CHECK #0000000162 | $600.00 |
| 01/31/2020 | DDA CHECK #0000000107 | $650.00 |
| 01/28/2020 | DDA CHECK #0000000747 | $1,000.00 |

| | | |
|---|---|---|
| 01/28/2020 | DDA CHECK #0000000106 | $1,000.00 |
| 01/28/2020 | DDA CHECK #0000000103 | $1,250.00 |
| 01/27/2020 | DDA CHECK #0000000105 | $1,200.00 |
| 01/24/2020 | DDA CHECK #0000000104 | $1,200.00 |
| 01/23/2020 | DDA CHECK #0002480744 | $600.00 |
| 01/23/2020 | DDA CHECK #0000000101 | $2,000.00 |
| 01/17/2020 | DDA CHECK #0000000746 | $600.00 |
| 01/16/2020 | DDA CHECK #0000000745 | $2,000.00 |
| 01/15/2020 | DDA CHECK #0000000742 | $1,375.00 |
| 01/14/2020 | DDA CHECK #0000000741 | $2,200.00 |
| 01/14/2020 | DDA CHECK #0000000743 | $800.00 |
| | **Total** | **$25,056.17** |

65. The total amount Whitaker spent on labor at the Property during that time was $57,925.96, as well as other household items not available in the furnished Property.

66. After listing the Property for rent on Craigslist.com, Martin engaged in a pattern and practice of deceiving Whitaker and inducing him to investing in a five-year leasehold when Martin had no plan to allow Whitaker to remain and, in fact, forcefully evicted Whitaker after only two months.

### COUNT 1

### BREACH OF CONTRACT

67. Plaintiff adopts paragraphs 7-63 as if fully set out herein.

68. Martin sought to intimidate Whitaker by filing a report regarding the pruning work performed by Whitaker, by entering the Property unannounced and uninvited, and by

forcefully taking the Property, locking Whitaker out, and changing the locks on the Property. A copy of a photograph of Martin changing the locks is available on request of Plaintiff but is not being filed herewith.

69.    Through these actions, Martin breach the terms of the lease and the rights to quiet enjoyment contained therein.

70.    Whitaker, sensing Martin was not acting in good faith, attempted to vacate the premises, and did successfully remove his person and many of his belongings, and was forced to seek alternate accommodations at added expense.

71.    As a result of Defendant's actions Plaintiff was substantially and seriously injured.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount to be determined by the Court hereby requests compensatory, general, and special damages be awarded, attorney's fees and cost, and any other relief the Court deems appropriate.

## COUNT 2

### FRAUD IN THE INDUCEMENT

72.    Plaintiff adopts paragraphs 7-63 as if fully set out herein.

73.    Defendant intentionally misrepresented, orally and in writing, the possibility of a long-term lease with an option to purchase and a cooperative relationship to improve the Property in order to induce Plaintiff to enter the contract and make repairs to the Property.

74.    Defendant affirmatively advanced the installation of a fiber option internet connection at substantial cost to Plaintiff.

75.    The misrepresentations were fraudulent material to, and the basis of the Lease.

76.    The misrepresentation did induce Plaintiff to enter or continue in a long-term lease and invest heavily in the Property.

77.   Plaintiff's reliance on the misrepresentation was reasonable, based on the Lease terms and the written correspondence between the parties after the Lease was signed.

78.   Plaintiff suffered serious and significant damage as a result of the misrepresentation.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount to be determined by the Court hereby requests compensatory, general, and special damages be awarded, attorney's fees and cost, and any other relief the Court deems appropriate.

## COUNT 3

### FRAUD IN THE FACTUM

79.   Plaintiff adopts paragraphs 7-63 as if fully set out herein.

80.   Defendant intentionally misrepresented, orally and in writing, amounts owed by Plaintiff to Defendant, particularly with respect to the use of the Guest House, electric utility "reimbursement" and allocation and calculation of repair and improvement work, and regarding the broadband internet installation.

81.   The misrepresentations were fraudulent material to Plaintiff's decisions with respect to the Property.

82.   The misrepresentation did induce Plaintiff to make certain payments and complete expensive improvements to the Property.

83.   Plaintiff's reliance on the misrepresentation was reasonable, based on the Lease terms and the written correspondence between the parties after the Lease was signed.

84.   Plaintiff suffered serious and significant damage as a result of the misrepresentation.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount to be determined by the Court hereby requests compensatory, general, and special damages be awarded, attorney's fees and cost, and any other relief the Court deems appropriate.

## COUNT 4

### VIOLATION OF FAIR DEBT COLLECTION PRACTICES ACT

85.   Plaintiff adopts paragraphs 7-63 as if fully set out herein.

86.   Defendant, through his agent attorney, sent a debt collection demand that failed to comply with federal law.

87.   Plaintiff is due the statutory penalty of $1,000, as well as attorney's fees and costs because of said violation and pursuant to said law.

88.   Plaintiff was physically injured and emotionally distressed by the forcible entry and unfair debt collations practice.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount of $1,000, as well as compensatory, general, and special damages be awarded, attorneys fees and costs, and any other relief the Court deems appropriate.

## COUNT 5

### NEGLIGENCE

89.   Plaintiff adopts paragraphs 7-63 as if fully set out herein.

90.   Defendant was negligent in the handling of his relationship with Plaintiff.

91.   Defendant had a duty to handle himself as a reasonable person in a manner as to not cause harm.

92.   Defendant breached his duty to act as a reasonable person.

93.   Defendant's breach was the direct and proximate cause of Plaintiff's injury and damage.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount to be determined by the Court hereby requests compensatory, general, and special damages be awarded, attorney's fees and cost, and any other relief the Court deems appropriate.

<u>**COUNT 6**</u>

<u>**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**</u>

94.     Plaintiff adopts paragraphs 7-63 as if fully set out herein.

95.     Defendant's conduct in entering and retaking the home, filing a police report for pruning work, and barring entry to recover belongings was extreme and outrageous, beyond all bounds of decency.

96.     Defendant's conduct was intention and reckless.

97.     Defendant's conduct caused severe emotional distress to Plaintiff.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount to be determined by the Court hereby requests compensatory, general, and special damages be awarded, attorney's fees and cost, and any other relief the Court deems appropriate.


Respectfully submitted,

March 5, 2020                                   **FOR THE PLANITIFF:**

/s/ *Robert V. Goldsmith, III*
Robert V. Goldsmith, III
V.I. Bar #R2034
P.O. Box 608
St. Thomas, U.S. Virgin Islands 00804
tgoldsmith@legal-cg.com